## Jack STANLEY, III v. STATE of Arkansas

5483                                    454 S. W. 2d 72

## Opinion delivered May 18, 1970

[Rehearing denied June 22, 1970.]

*Harper, Young & Smith,* for appellant.

*Joe Purcell,* Attorney General; *Mike Wilson* and *Don Langston,* Asst. Attys. Gen., for appellee.

FRANK HOLT, Justice. The appellant was charged by information with the crime of first degree murder. Upon trial, the State waived the death penalty. A jury found appellant guilty of the alleged offense and assessed his punishment at life imprisonment in the State Penitentiary. From a judgment on that verdict comes this appeal.

The appellant first contends for reversal that the evidence is insubstantial to show a willful, deliberate, malicious, and premediated killing. The appellant was fourteen and one-half years of age at the time he admittedly shot and killed his stepfather.[1] The State adduced evidence that when the police officials appeared at appellant's home shortly after this tragedy occurred, the appellant admitted shooting his stepfather and said that he didn't know the gun was loaded. The appellant was also interrogated by the prosecuting attorney and released in the custody of his mother. After further investigation, appellant was ques-

---

[1] Ark. Stat. Ann. § 41-112 (Repl. 1964) provides that: "An infant under twelve [12] years of age shall not be found guilty of any crime or misdemeanor." Between the ages of 12 and 14 years the presumption is that one is incapable of discerning right from wrong until the contrary is affirmatively shown. *Gilchrist* v. *State,* 100 Ark. 330, 140 S. W. 260 (1911); *Garner* v. *State,* 97 Ark. 63, 132 S. W. 1010 (1910).

tioned a few days later at which time he claimed he did not know why he shot his stepfather. He stated that his stepfather had punished him on three occasions; however, he disclaimed any hatred for him. He admitted he had made a previous statement that he intended to kill his stepfather. A witness, who was a neighbor and about the same age as appellant, testified that the appellant was in his home twice on the day of the shooting. Appellant told this witness that he intended to shoot his stepfather that night and that he had "tried" to kill him about two days before and he couldn't get a mechanism of the rifle to work as his stepfather drove up to the house. Appellant expressed a hatred for his stepfather because of alleged physical punishment administered by him. Another youthful member of this household testified that appellant told her on that same day that he intended to kill his stepfather and when she replied that he must be "kidding," appellant said he could get by with it by making some excuse, running away or by putting a silencer on the gun. He expressed to her a hatred for his stepfather and had made similar statements of dislike previously. Another witness, about the age of appellant, testified that he came by this house as the appellant was leaving and he understood appellant to say that he was going to shoot his stepfather because of his dislike for him and that on other occasions he had heard appellant say that his stepfather beat him up once or twice.

The appellant did not testify. However, one of his narrations to the police was that when his stepfather came into the house late in the afternoon, the stepfather opened the gun cabinet and mentioned that he was going to trade off the rifle; that appellant asked to see the gun and that his stepfather handed it to him and went into an adjoining room; that appellant went to the gun cabinet, picked up a shell, loaded the gun, and then sat down on the divan; that his stepfather returned and was standing at a nearby table; "* * * I didn't aim the rifle at him, I just held it with the barrel pointing towards him and I shot

him. After I shot him he fell forward and caught himself against the chair and bent over then fell back on the floor. * * * After I shot him, I pulled the jack open and the shell fell out. I reached down and picked up the shell and looked at it and I laid it down on the table in front of the sofa. I then laid the rifle down and walked over to see about Ed. * * * It wasn't long after that, maybe a couple of minutes before my mother came in. When she did I said, mama, mama I shot Ed. * * * I don't know why I did it, there was something in me that just says kill, kill, kill."

Appellant's court appointed trial counsel ably and forcefully argues on appeal and in oral argument that: "* * * this is not premeditation from the standpoint of the individual taking a life, but rather the immature reactions of a child attempting to cope with a situation which he did not understand, i. e., the loss of his grandmother and the readjustment to life without her."

Appellant's defense was based only upon the plea of insanity.[2] Appellant's counsel asserts that this youthful offender was mentally disturbed because of his inability to reconcile differences, conflicts and crises he had experienced. Evidence was adduced from several lay witnesses in support of this contention, and especially with reference to the effect of the loss of his grandmother about two months previously. Also, a local psychiatrist testified that in his opinion the appellant was psychotic or mentally ill to the degree of not being responsible for the alleged act of murder. Previous to the trial the appellant was committed by a court order to the Arkansas State Hospital for a mental examination and was returned as being without psychosis. One of the doctors from the Arkansas State Hospital testified that it was the opinion of himself and the other members of the hospital psychiatric staff that appellant was not psychotic and that

---

[2] Section 41-111 states: "A person shall be considered of sound mind who is neither an idiot nor a lunatic, or affected with insanity, and hath arrived at the age of fourteen [14] years, or before that age, if such person know the distinction between good and evil."

he was not mentally ill to the extent of being in-
capable of choosing between right and wrong and
was, therefore, legally responsible for his acts.

The State's theory of first degree murder and the
appellant's defense of insanity were both fully pre-
sented to the jury. The trial court instructed the jury
on all degrees of homicide, the issue of insanity, and,
further, told the jury that should it find the appellant
insane, he would be committed to the State Hospital
until the superintendent had determined that appellant
had regained his sanity. The jury's anxiety and agoniz-
ing duty in resolving the conflicting theories and evi-
dence, and in making its determination from the vari-
ous verdict forms are apparent from questions pro-
pounded by it. It was within the province of the jury
to determine the credibility of the witnesses and the
weight to accord to their testimony in resolving these
conflicting factual issues. It is firmly established that
on appeal we must view the evidence in the light most
favorable to the appellee and affirm the jury's finding
and verdict if there is any substantial evidence to sup-
port it. *Harris* v. *State,* 239 Ark. 771, 394 S. W. 2d
135 (1965); *Stockton* v. *State,* 239 Ark. 228, 388 S. W.
2d 382 (1965); *Veatch* v. *State,* 221 Ark. 44, 251 S. W.
2d 1015 (1952). Therefore, we must find no merit in
appellant's contention since we cannot say there was
no substantial evidence to support the verdict of the
jury.

Appellant next contends that the court erred in per-
mitting the introduction of the State's exhibits and al-
lowing certain testimony. Appellant asserts that the
introduction into evidence of the weapon, the ex-
pended cartridge, a photograph of the deceased, the
bullet, a ballistics report, and fingerprints was prejudi-
cial error. He argues that these items and the testi-
mony accompanying their introduction were unneces-
sary since it was conceded that the appellant com-
mitted the act of shooting his stepfather. It is ap-
pellant's position that the testimony and these exhibits
were used to inflame and prejudice the minds of the

jurors against the appellant. We cannot agree. The burden rested upon the State to prove beyond any reasonable doubt the allegation of first degree murder. The elements of malice, intent, deliberation, and premeditation are essential requisites in the proof of first degree murder. All of these exhibits and accompanying testimony were relevant and material to the issue as alleged in the information. *Harris* v. *State, supra.* Furthermore, the admission of the photograph of the deceased rests in the sound discretion of the trial court. *Davis* v. *State,* (May 5, 1969) 440 S. W. 2d 244; *Stewart* v. *State,* 233 Ark. 458, 345 S. W. 2d 472 (1961); *Lee* v. *State,* 229 Ark. 354, 315 S. W. 2d 916 (1958). The photograph of the deceased shows him fully clothed and in the position in which he was found at the scene of the alleged crime. We find no abuse of discretion by the trial court in the case at bar.

The appellant next asserts that the court erred in refusing to give a requested instruction which is based upon the *Durham* rule which pertains to the issue of insanity. This rule is predicated upon the theory that a defect or disease of the mind constitutes a valid defense. *Durham* v. *United States,* 214 F. 2d 862 (D. C. Cir. 1954), 45 A. L. R. 2d 1430. We have repeatedly rejected this theory. *Stewart* v. *State, supra; Downs* v. *State,* 231 Ark. 466, 330 S. W. 2d 281 (1959). We have held that the fact one has a mind which is below normal does not exempt one from punishment for his criminal behavior. *Ezell* v. *State,* 217 Ark. 94, 229 S. W. 2d 32 (1950). Our most recent rejection of the *Durham* rule and reaffirmance of our rule enunciated in *Bell* v. *State,* 120 Ark. 530, 180 S. W. 186 (1915) is found in *Davis* v. *State, supra.* This rule recognizes the defense of insanity which prevails when the defendant proves by a preponderance of the evidence, first, that at the time of the alleged crime, the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, second, if he did know it, that he did not know that he was doing what was wrong, or, third, if he knew the nature and quality of the act and knew that

it was wrong, that he was under such duress of mental disease as to be incapable of choosing right from wrong as to the act done and unable, because of the disease, to resist the doing of a wrong act which was the result solely of his mental disease.

The appellant next contends that the court erred in permitting the prosecution to refer to matters in his closing argument that were not in evidence and that were designed to inflame and prejudice the minds of the jurors. Appellant refers to that portion of the closing argument by the prosecuting attorney who stated: "Other people the age of the defendant, again are watching. It may well be that this defendant was watching events that occurred before this one did." The trial court had previously admonished the jury during closing arguments that: "Any argument or statements or remarks of the attorneys having no basis in the evidence should be disregarded by you." The trial court is accorded wide discretion in controlling and supervising the argument of counsel before a jury. *Peters* v. *State*, (Feb. 23, 1970) 450 S. W. 2d 276; *Parrott* v. *State*, (April 14, 1969) 439 S. W. 2d 924. No manifest abuse of discretion is demonstrated as a result of this argument to the jury.

The appellant next contends that the trial court erred in overruling the appellant's motion to transfer the cause of action to the juvenile court. The alleged offense occurred on March 13, 1969. On March 17, 1969, after further investigation, the appellant was taken into custody for more questioning. On that date an information was filed by the prosecuting attorney, the appellant was then arraigned and preparations were made to transfer him to the State Hospital for a mental examination. After being found without psychosis by the State Hospital staff, appellant's court appointed counsel petitioned the trial court, before trial, to transfer the case to the juvenile or county court. The motion was denied. Ark. Stat. Ann. § 45-241 (Repl. 1964) provides that it was within the discretion of the trial court to transfer the appellant's case to

the juvenile court. The argument advanced by appellant on this point was discussed in *Monts* v. *State*, 233 Ark. 816, 349 S. W. 2d 350 (1961), where we recognized that, under the provisions of our statutes, the matter of the transfer of a cause of action against a juvenile to the juvenile court is within the sound discretion of the trial court. See, also, *Pritchard* v. *Downie*, 216 F. Supp. 621 (D. D. C. 1963). Our legislature has also provided that following a conviction of a felony, the trial court is then authorized to send a juvenile under eighteen (18) to the penitentiary "if in the judgment of the trial judge such course may be expedient." Ark. Stat. Ann. § 46-308 (Supp. 1969). The trial court was in a position much superior to ours to evaluate the extremely onerous problems presented by appellant's motion. We cannot say that in the circumstances there was an abuse of discretion by the trial court in refusing to grant appellant's pretrial motion.

Nor can we agree with appellant's assertion that the entire proceedings of the appellant's trial constitute a violation of his constitutional rights, both state and federal.

This case has given us much concern. However, finding no error, the judgment is affirmed.